**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALEXANDER HALL and LAURENE GERMANO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Alexander Hall and Laurene Germano ("Plaintiffs"), individually and on behalf of all others similarly situated and the general public, bring this Class Action Complaint against defendant Subaru of America, Inc. ("Subaru" or "Defendant") based on personal knowledge and the investigation of counsel, and allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs bring this action individually, and on behalf of nationwide and state classes (more fully defined below), for the benefit and protection of purchasers and lessees of 2023-2026 Subaru Legacy, Outback, and Ascent vehicles; 2024-2026 Subaru Impreza and Crosstrek vehicles; 2022-2026 Subaru Forester and WRX vehicles; and 2025-2026 BRZ vehicles ("Class Vehicles" or "Vehicles") equipped with defective collision avoidance and/or mitigation features including

autonomous emergency braking ("AEB") systems that utilize Pre-Collision Braking ("PCB") and Reverse Automatic Braking ("RAB") and Lane Keep Assist ("LKA"), against Subaru. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on the investigation of counsel, including analysis of publicly available information.

2.      Autonomous emergency braking systems are one of the most highly touted advancements in automobile safety. As described by Consumer Reports, AEB systems "detect a potential car crash and automatically brake to avoid a collision or lessen the severity of impact."[1] Forward-oriented systems activate when the car is driving forward, and rearward-oriented systems activate when the car is in reverse.[2] When working properly, these systems are intended to reduce the incidence of collisions and the resultant injuries.

3.      Subaru's PCB, along with LKA, is a part of the "EyeSight® Driver Assist Technology" suite of safety features. As described by Subaru on its website[3]: "EyeSight monitors traffic movement, optimizes cruise control, and warns you when you're swaying outside your lane."

---

[1] *See* Keith Barry, *Guide to Automatic Emergency Braking*, CONSUMER REPORTS (Updated May 1, 2024), https://www.consumerreports.org/car-safety/automatic-emergency-braking-guide/.

[2] *Id.*

[3] *See* SUBARU OF AM., INC., *EyeSight Driver Assist Technology,* https://www.subaru.com/eyesight.html (last visited May 8, 2026).

4.      As further described by Subaru, PCB, a forward-oriented system, "helps you avoid or reduce frontal impacts by alerting you and applying full braking force in emergency situations," and "can even bring you to a full stop if necessary."[4] The owner's manual for vehicles equipped with EyeSight technology claims: "[PCB] uses a following distance warning feature to warn the driver to take evasive action when there is the possibility of a collision with a vehicle or obstacle in front of you. If the driver does not take evasive action, the brakes are applied automatically to help reduce vehicle collision damage or, if possible, help prevent a collision."[5]

5.      Subaru further makes the following claims regarding its PCB systems:

> When there is the risk of a rear-end collision with an obstacle in front, the EyeSight system helps to prevent or minimize a collision by warning the driver. If the driver still does not take evasive action to avoid a collision, the brakes can be automatically applied just before the collision in order to reduce impact damage, or if possible, prevent the collision. If the driver takes evasive action to avoid a collision, Pre-Collision Braking Assist will operate in order to help the driver to prevent or minimize the collision. This system can be effective not only with direct rear-end collisions, but also with offset rear-end collisions.[6]

6.      Subaru apparently has so much confidence in these systems that it has made them the default setting on its vehicles and resistant to driver alteration:

---

[4] *Id.*

[5] *See* SUBARU CORP., *Owner's Manual* 12 (2018), https://techinfo.subaru.com/stis/doc/ownerManual/MSA5M1913A_STIS.pdf.

[6] *Id.* at 25.

> Even when the Pre-Collision Braking System is turned off, if the ignition switch is turned off and the engine is then restarted, the Pre-Collision Braking System will be turned on. The system default setting when the vehicle is restarted in "ON".[7]

7. This means that even if drivers are told by their dealership to turn malfunctioning systems off (as has been the case for some Plaintiffs and putative Class members), they must remember to do so every time they restart their vehicle at risk of having the PCB system activate. This is an ineffective solution for a vehicle feature that has been advertised to function properly.

8. Similarly, RAB, a rearward-oriented system, senses objects behind a Subaru vehicle when backing up at a low speed and applies the brakes as necessary.[8]

9. The front cameras are also employed by other EyeSight features, including LKA. The cameras are designed to monitor the road for lane markings and alert the driver if the vehicle strays over the lines or sways between them. If the driver does not respond quickly enough, LKA is supposed to correct the vehicle's steering to keep the vehicle in the lane; as described by Subaru:

> The stereo camera detects lane markings (including Botts' dots) of the lane and the system assists the steering operation by working with the electric power steering to help keep your vehicle in its lane when driving on expressways, freeways and interstate highways.[9]

---

[7] *Id.* at 38.

[8] *See Subaru Reverse Automatic Braking Explained* (2020 Updated), YOUTUBE (June 25, 2020), https://www.youtube.com/watch?v=gYTshupRY38.

[9] *See* SUBARU CORP., *supra* note 5, at 66.

10. Within the United States, Subaru has widely disseminated advertising alleging the superior safety of its EyeSight-equipped vehicles. Subaru particularly emphasized the PCB or forward AEB system described *infra.* Indeed, Subaru's commercials have become ubiquitous on television, touting Subaru's superior commitment to safety and the EyeSight systems, promising consumers peace of mind.

11. For these systems to work as intended and advertised, Subaru is responsible for ensuring that its suppliers manufacture the component systems correctly and that they are installed properly at the factory. Subaru is also responsible for ensuring that the AEB system has adequate programming to handle real-world driving conditions, and that the components systems communicate properly with one another. For example, the front-facing cameras or the rear-facing sensors must communicate information to the braking system and the ABS Control Module to apply the brakes; to the Transmission Control Module ("TCM") to shift the car into the proper gear; and to the Engine Control Module ("ECM") to limit power from the engine so that the vehicle is no longer propelled forward. Calibrating these systems to work together properly is Subaru's responsibility.

12. Subaru failed to inform Plaintiffs and members of the Class before or during the time of sale that the AEB systems in Class Vehicles have design, manufacturing, and workmanship defects, including, but not limited to, poor

calibration of the software from multiple control modules, including the ABS Control Module, such that they are prone to activating the brakes when there are no objects in front of and/or behind the vehicle. The AEB systems also sometimes fail to entirely activate when there are persons or objects in front of the vehicle. This occurs due to miscommunication between all the systems involved in automatic braking, including the sensors, the camera, the brakes, and the transmission (the "AEB System Defect"). The AEB System Defect prevents Class Vehicles from behaving as designed and advertised in real-world driving conditions.

13. As a result of the AEB System Defect, Class Vehicles abruptly slow down, or stop entirely, without driver input when there are no obstacles in front of or behind the vehicle. This presents a clear-cut safety hazard, increasing the chances of a collision.

14. Conversely, the AEB system also fails to activate in situations it was designed to detect and mitigate, such as when a pedestrian appears or a vehicle stops abruptly in front of or behind Class Vehicles. Thus, the AEB System Defect makes the AEB system unpredictable and makes Class Vehicles unsafe. At the same time, the AEB System Defect renders the system useless when it is most needed.

15. The LKA feature is also defective. Subaru failed to disclose to Plaintiffs and the members of the Class, before or at the time of sale, that the LKA feature in the Class Vehicles has design, manufacturing, and/or workmanship defects. For

6

example, Class Vehicles suffer from poor software calibration, impacting multiple control modules, including the Power Steering Control Module, such that the LKA feature resists driver input when the driver is attempting to change lanes or driving on a road with construction barriers, or malfunctions when the road has multiple lines due to construction. Further, the LKA system malfunctions and shuts down entirely while Class Vehicles are in motion and cannot be used again until the vehicle is restarted (the "LKA Defect" and, together with the AEB System Defect, the "Defects"). The LKA Defect prevents the Class Vehicles from behaving as designed and advertised in real-world driving conditions.

16.    As a result of the LKA Defect, the LKA system in Class Vehicles jerks the steering wheel without cause. Moreover, the LKA system prevents Class Vehicles from changing lanes, or steers the Class Vehicles into other vehicles. At times, the LKA system also fails to function completely. Thus, the LKA Defect makes Class Vehicles unsafe and makes the operation of the vehicle unpredictable for the Class.

17.    Based on pre-production testing, including design failure mode analysis, quality monitoring data, quality control audits, early warranty claims, replacement part orders, consumer complaints submitted to Subaru's authorized network of dealers, the NHTSA, and online forums dedicated to Subaru vehicles, Defendant was aware of the Defects in the Class Vehicles as early as 2012. Despite

being aware of the Defects and receiving numerous complaints, Subaru knowingly, actively, and affirmatively failed to disclose the Defects. Further, Defendant actively concealed the existence of the Defects, including in its advertising and manuals, which describe the EyeSight, PCB, RAB, and LKA systems. Defendant did this to increase profits by selling additional Class Vehicles at inflated prices.

18.     Defendant also recently settled a case involving the same issues in vehicles from earlier model years.[10] That the issues persist in the Class Vehicles shows that Subaru has not taken remedial measures or offered improvements to its software to rectify this well-documented issue.

19.     Discovery will show that Class Vehicles utilize the same or substantially identical core vehicle components, and that the Defects are the same for all Class Vehicles.

20.     For the Class Vehicles, Subaru offers a three-year or 36,000-mile New Vehicle Limited Warranty (whichever comes first) for new car purchasers, and a seven-year or 100,000-mile Powertrain Warranty (whichever comes first) for Certified Pre-Owned vehicles. Despite its knowledge of the Defects, Subaru has not disclosed the existence of the Defects and has not permanently fixed the Defects, exposing Plaintiffs, Class members, and the general public to unsafe driving conditions.

---

[10] *See Sampson v. Subaru of America, Inc.,* No. 1:21-cv-10284-RMB-KMW (D.N.J.).

8

21. The alleged AEB System Defect was inherent in each Class Vehicle and was present in each vehicle at the time of sale. Similarly, the alleged LKA Defect was inherent in each Class Vehicle and was present in each vehicle at the time of sale.

22. Subaru knew about the Defects present in every Class Vehicle, along with the attendant safety problems, and failed to disclose—and actively concealed—this information from Plaintiffs and Class members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Class Vehicles, Subaru has insisted that the vehicles are working correctly.

23. If Plaintiffs and Class members had known about the Defects at the time of sale or lease, Plaintiffs and Class members would not have purchased or leased Class Vehicles or would have paid less for them.

24. As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defects, Plaintiffs and Class members were harmed and suffered actual damages in that their vehicles are defective; they overpaid for defective vehicles; and the vehicles' driver-assist technology systems increase their chances of being involved in a collision by activating without cause and failing to activate when they should.

## II.   THE PARTIES

### *Plaintiff Alexander Hall*

25.   Plaintiff Alexander Hall is a citizen and resident of the State of Maine.

26.   In or around April 2024, Plaintiff Hall purchased a new 2024 Subaru Forester from Charlie's Subaru, an authorized Subaru dealership located in Augusta, Maine.

27.   Plaintiff Hall purchased his vehicle primarily for personal, family, or household use.

28.   Passenger safety and reliability were primary factors in Plaintiff Hall's decision to purchase his vehicle. Plaintiff Hall researched the Forester on the internet, by "Googling" the vehicle and visiting Subaru's website. Additionally, he spoke with the salesperson at Charlie's Subaru, who advised him about the safety systems in the vehicle and showed him how they operated. Subaru could have and should have disclosed the AEB and LKA System Defects through each of these communications but did not.

29.   Had Subaru disclosed the AEB or LKA System Defects before Plaintiff Hall purchased his vehicle, he would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Hall. Like all members of the Class, Mr. Hall would not have purchased his Class Vehicle,

10

or would have paid less for the vehicle, had he known of the AEB or LKA System Defects.

30.     In addition, at the time Plaintiff Hall purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Subaru and its authorized dealership that the vehicle was fully functional, safe, durable, and reliable, and/or that the AEB and LKA systems operated correctly and effectively. Plaintiff Hall relied on those representations, and the omission of a disclosure of the AEB and LKA System Defects, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle, or would have paid less for it.

31.     Within the first year of ownership, Plaintiff Hall began to experience the AEB System Defect; the AEB system would engage the brakes suddenly while the vehicle was moving, despite there being no obstacles in the way. On one occasion, Mr. Hall was operating the vehicle on the highway, under normal operating conditions, when the AEB system engaged, bringing the car to an abrupt halt and almost causing a rear-end collision with the vehicle behind him. On a separate occasion, the AEB system in Mr. Hall's vehicle engaged while he was making a routine left-hand turn with no obstructions, causing his vehicle to lose power in the intersection and forcing oncoming vehicles to take evasive actions to avoid "T-boning" Mr. Hall.

32.     Plaintiff Hall has also experienced issues with the LKA system. He is unable to use the Adaptive Cruise Control system in his vehicle because the LKA will pull him off the road or into adjacent lanes when no obstructions are present.

33.     Plaintiff Hall has complained to Charlie's Subaru about the issues on multiple occasions when he took his vehicle in for routine service, but the dealership brushed off his complaints and indicated that the AEB and LKA systems were functioning properly. The dealership further advised Mr. Hall to turn off the EyeSight and LKA modules if he continues to experience problems.

34.     Even though Mr. Hall complained, no repairs have ever been attempted by Subaru or any authorized repair facility such as Charlie's Subaru.

35.     Plaintiff Hall continues to intermittently experience sudden and unnecessary braking while driving.

36.     As a result of the Defects, Mr. Hall has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

37.     At all times, Plaintiff Hall, like all members of the Class, has attempted to drive his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

38.     Although Plaintiff Hall is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for, or labeling of, the vehicles.

### *Plaintiff Laurene Germano*

39.    Plaintiff Laurene Germano is a citizen and resident of the Commonwealth of Virginia.

40.    In or around June 2024, Plaintiff Germano purchased a new 2024 Subaru Crosstrek from Flow Subaru, an authorized Subaru dealership located in Charlottesville, Virginia.

41.    Plaintiff Germano purchased her vehicle primarily for personal, family, or household use.

42.    Passenger safety and reliability were primary factors in Plaintiff Germano's decision to purchase her vehicle. Plaintiff Germano researched the Crosstrek on the internet and visited Subaru's website. Additionally, she spoke with the salesperson at Flow Subaru, who advised her about the safety systems in the vehicle. Subaru could have and should have disclosed the AEB and LKA System Defects through each of these communications but did not.

43.    Had Subaru disclosed the AEB or LKA System Defects before Plaintiff Germano purchased her vehicle, Plaintiff Germano would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Germano. Like all members of the Class, Plaintiff Germano would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the AEB or LKA System Defects.

44.    In addition, at the time Plaintiff Germano purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that the vehicle was fully functional, safe, durable, and reliable, and/or that the AEB and LKA systems operated correctly and effectively. Plaintiff Germano relied on those representations, and the omission of a disclosure of the AEB and LKA System Defects, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle, or would have paid less for it.

45.    While her Vehicle was still within the New Vehicle Limited Warranty period, Plaintiff Germano experienced the AEB System Defect. When Plaintiff Germano was driving at approximately 40 mph on a rural local road with great visibility and no obstacles, the AEB system in her vehicle suddenly and heavily engaged the brakes, causing the vehicle to quickly slow down to 15 mph. Plaintiff Germano suffered minor injuries from this sudden change in speed, resulting in pain to her neck and shoulders.

46.    Since her experience with the Defect, Plaintiff Germano turns off the pre-collision assist feature every time she starts her vehicle, even though that feature, along with other safety mechanisms in the vehicle, is very important to her.

47.    On April 22, 2026, Plaintiff Germano took her vehicle to Flow Subaru to find a fix for the Defect. The dealership informed her that there were no codes

associated with her complaints, and that there was nothing they could do to address the issue.

48.    Even though Plaintiff Germano complained, no repairs have ever been attempted by Subaru or any authorized repair facility such as Flow Subaru.

49.    Plaintiff Germano continues turn off the pre-collision assist feature every time she starts her vehicle.

50.    As a result of the Defects, Plaintiff Germano has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

51.    At all times, Plaintiff Germano, like all members of the Class, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

52.    Although Plaintiff Germano is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### *Defendant*

53.    Defendant Subaru of America, Inc. is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey. Defendant's headquarters is situated on a 250,000-square-foot campus, wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based to carry out its business

15

operations. There is also an approximately 100,000-square-foot national service training center for Subaru adjacent to its campus, which houses service training, service engineering, and product engineering functions. Defendant markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate, Subaru Corporation, formerly known as Fuji Heavy Industries, Ltd., ("Subaru Corp.").

54.    Defendant is the United States sales and marketing subsidiary of Subaru Corp. and is a wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States. Defendant has a nationwide dealership network and operates offices and facilities throughout the United States.

55.    In order to sell vehicles to the general public, Defendant enters into agreements with dealerships, which are then authorized to sell Subaru-branded vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new Subaru vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Subaru provides directly to consumers. These contracts give Subaru a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repairs at an authorized dealership are also completed according to Subaru's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements

between Subaru and the authorized dealers, consumers such as Plaintiffs can receive services under Subaru's issued warranties at dealer locations that are convenient to them.

56.    Defendant encourages its agents, the dealerships, to engage "Subaru Ambassadors," who then create and post pro-Subaru content on social media websites such as Facebook and Twitter. Subaru Ambassadors also reach out to consumers on internet comment boards, answer questions on behalf of Subaru, monitor other websites for content that is negative for Subaru, and can provide coupons applicable to the purchase of Subaru vehicles. Subaru Ambassadors also have direct access to Subaru's customer support service teams.[11]

57.    Defendant, in conjunction with Subaru Corp., develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network. Defendant is also responsible for the production and content of the information on the "Monroney" Stickers.

58.    Defendant marketed, sold, and warranted the Class Vehicles, including Plaintiffs' vehicles.

---

[11] *See* COMPETITION SUBARU, *Become a Subaru Ambassador*, https://www.competitionsubaru.com/become-a-subaru-ambassador/ (last visited May 8, 2026).

## III.   JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

60.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant transacts business in this district and is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district. Additionally, Defendant has advertised in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

61.     This Court has personal jurisdiction over Defendant because it is incorporated in this District, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## IV.  FACTUAL ALLEGATIONS

62.   For years, Subaru has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles. Subaru has marketed and sold millions of Class Vehicles throughout the United States, including through its nationwide network of authorized dealers and service providers.

63.   Subaru has thousands of authorized dealerships across the United States, all of which are under Subaru's control. Subaru authorizes these dealerships to sell Subaru vehicles, parts, and accessories, service and repair Subaru vehicles using Subaru parts, and perform warranty repairs on Subaru's behalf. Subaru's automotive sales through those dealerships for the United States, for the calendar year 2025, totaled 643,591 vehicles.

64.   One of the most heavily advertised pieces of technology in Subaru vehicles is the EyeSight suite of safety features, as well as other driver-assistance technologies such as RAB. One of the most advertised capabilities of EyeSight is the autonomous braking system that is supposed to warn the driver of an obstacle in the road, and also engage the brakes independently if the driver fails to react. This system is a part of other collision avoidance systems installed in Class Vehicles, including LKA, which have the goal of preventing or reducing the severity of an impact.

65.    EyeSight was first introduced in Subaru vehicles in 2012, in the limited trims of the 2013 model Legacy and Outback models. As with EyeSight in the current generation, it utilized cameras mounted behind the windshield near the roof of the vehicle to monitor the road in front of the vehicle. Reverse Automatic Braking was not introduced until the 2017 model year. Like EyeSight, it relies on a camera, the back-up camera, as well as rear-mounted sonic sensors.

66.    Subaru claims that since their release, these systems have been continuously improved, with recent marketing material offering:

> The latest version of EyeSight® debuts on the all-new 2026 Subaru Outback, bringing a wider range of safety features and driver-assist functions than ever before. The all-new Outback adds acceleration override assist, front and side alert assist with braking, which actively positions the vehicle to reduce collision risk. For the first time in any Subaru vehicle, Emergency Stop Assist with Safe Lane Selection is making its debut on the 2026 Subaru Outback.[12]

67.    Marketing materials distributed by Subaru dealerships in 2026 also contain false promises of improvements to the EyeSight technology:

> Subaru's EyeSight technology has been excellent for years. It's why Subaru has earned more IIHS TOP SAFETY PICK awards than any other mainstream brand. But the 2026 version is different. It's more advanced.
>
> The biggest change? The system now uses three forward-facing cameras plus radar sensors instead of just cameras. Why does that matter? Because cameras have limits. In heavy rain, fog, or snow,

---

[12] *See* Press Release, *Subaru Debuts Next-Generation Technology on All-New 2026 Outback* (Nov. 18, 2025), https://media.subaru.com/pressrelease/2392/subaru-debuts-next-generation-technology-all-new-2026.

cameras can struggle. Radar doesn't care about weather—it works just fine when visibility is terrible. Now you have both systems working together, giving the car way better understanding of what's around it.

The cameras also got a wider-angle lens on the new system. That means the car can spot pedestrians and cyclists sooner. That's critical because a lot of accidents happen with people who come into the car's path. Earlier detection means more time to react or brake.

The whole system processes information faster than before too. That matters when seconds count.[13]

68.     The cameras and sensors used by the EyeSight suite are shared with the various components of the Driver Assist Technologies, including Pre-Collision Braking, Lane Keep Assist, and Adaptive Cruise Control.

69.     As with other systems in a vehicle, the AEB system is run by a control module. This module is equipped with a proprietary algorithm that takes the data acquired from camera and sensors, as well as other modules in the vehicle such as the transmission control module to determine the speed, acceleration, and distance for both the vehicle itself and the object ahead.

70.     In any given vehicle model, integration and calibration of the AEB system typically occurs near the end of the research and development process, so that the control module can be given final values for vehicle weight and configuration. This is overseen by the vehicle manufacturer, often with assistance

---

[13] Hamid Seifi, *The New 2026 Subaru Safety Features: What You Actually Need to Know* (Dec. 18, 2025), SUBARU OF BEND BLOG, https://www.subaruofbend.com/the-new-2026-subaru-safety-features-what-you-actually-need-to-know/.

from suppliers' engineers. Modules as provided by the suppliers must be "tuned" both to achieve the desired goal of the vehicle manufacturer as well as to work with all the other modules in the vehicle.

71.    Discovery will show that the Defects are caused by deficiencies in the design, materials, manufacture, and/or workmanship of system components; in the code underlying the algorithms that control the AEB and LKA system responses; and/or in the calibration and integration of the software controlling the driver-assistance systems with the software that run related systems in the vehicle, including the steering, transmission, and braking systems.

72.    Further, in order for the sensors and cameras used by the systems to function properly, impurities must be controlled during manufacture. They also must be installed and centered precisely. The slightest variations in materials or positioning cause these systems to malfunction. Discovery will show that the Defects are caused in part by such manufacturing issues.

73.    Moreover, the software that controls the EyeSight or Reverse Automatic Braking response—i.e., the underlying coding and algorithm which discriminates between landscape and obstacles and then decides on the correct response—suffers from programming defects during manufacturing which differ from the intended design of the software.

22

74. Subaru represented that the AEB systems and the LKA function in the Class Vehicles would prevent collisions and accidents, as opposed to merely reducing the severity of the impact. However, Subaru overreached, improperly tuning the driver-assistance systems to fully apply the brakes when the system detects anything it perceives as stationary in front of the vehicle, regardless of its size or level of risk to the vehicle based on its location. The result is that the systems activate unnecessarily early and with unnecessary force. Furthermore, the camera system shared by the AEB and LKA systems does not always accurately identify what items are stationary.

75. These same systems fail to detect moving objects that cross in front of Class Vehicles, in contrast to Subaru's commercials, which show vehicles stopping autonomously when another vehicle suddenly cuts in front of a Subaru vehicle.

76. Moreover, Subaru's testing and validation procedures were inadequate to reproduce real-world conditions, including driver reaction time, the existence of large objects on the side the road (e.g., garbage cans, metal guard rails), tunnels, the presence of extreme curves in certain roads (including on- and off-ramps to highways and freeways), parked cars in a parking lot, and the inclination at the end of driveways and at entrances to parking lots.

77. Despite this inadequate calibration and tuning process which fails to account for real-world driving conditions, Subaru has touted its Driver Assistance

Technologies as providing superior safety for drivers and passengers, by offering "[a]n extra set of eyes on the road and if need be, an extra foot on the break when you drive."[14]

78.    In fact, Subaru's commercials often showcase exactly how fast this system can supposedly react to protect the vehicle's occupants. For example, one early commercial for the EyeSight system shown in American television markets showcased Subaru's history of safety innovation "allowing [Subaru] to lead the world in peace of mind."[15] In this commercial, entitled "A Life of Safety," Subaru heralds "a car that can see trouble and stop itself to avoid it" by launching a 2014 Subaru Legacy into a wall at an apparently high speed. The vehicle reacts by detecting the wall as an obstacle, sounding an alarm, and activating the brakes, preventing the vehicle from touching the wall. The voiceover announces "nobody beats Subaru models with EyeSight" for front crash prevention.[16] However, this advertising is deceptive; contrary to the perception created for the audience, the vehicle in the commercial was never traveling more than 20 miles per hour. In fact,

---

[14] *See EyeSight Driver Assist Technology*, *supra* note 3. *EyeSight Driver Assist Technology*, https://www.subaru.com/eyesight.html (last visited May 10, 2026); *See also Subaru EyeSight, A Life of Safety*, YOUTUBE (June 5, 2014), https://www.youtube.com/watch?app=desktop&v=spat4V_4oBk.

[15] *Id*.

[16] *Id.*

EyeSight cannot prevent a collision when there is a more than 20-mile-per-hour difference between the vehicle and the object ahead.

79.    In another Subaru commercial shown in United States television markets, a man wakes up in the hospital after a collision. He and his wife get out of their hospital beds and are driven back to the scene of their car accident by an ambulance, where they get back into their Subaru Impreza. Once again, it speeds towards a suddenly stopped truck, but this time, the Impreza detects the obstacle and applies the brakes, preventing another collision.

80.    In another Subaru commercial shown in United States television markets, a man is distracted by his children in the back of his Subaru Ascent when the car in front them abruptly brakes to avoid a tractor trailer. As images from his life with his family and children flash before his eyes, the voice-over announces, "Life doesn't give you many second chances … but a Subaru can." The Ascent flashes the "Obstacle Detected" warning and applies the brakes, preventing a collision.[17]

81.    These advertisements are just three of the many similar public statements Subaru has caused to be disseminated within the United States regarding

---

[17] *See* Subaru Ascent TV Spot, *Important Moments,* ISPOT (Jan. 22, 2021), https://www.ispot.tv/ad/tFci/2021-subaru-ascent-important-moments-t2.

the safety, reliability, and functionality of the AEB systems installed in Class Vehicles.

82. Similarly, Subaru has also advertised the functionality of the LKA feature, which is dependent on the same cameras that are used in PCB and Adaptive Cruise Control features. This feature "can help steer you back in" your lane if you fail to react to a lane departure warning.[18]

83. Subaru also heavily advertised the functionality of other Driver Assistance Technologies, including Adaptive Cruise Control, which shares use of the cameras. According to this commercial, distributed widely on Facebook, among other places, the Adaptive Cruise Control allows the driver of a Subaru Forester to take his foot off the accelerator and brake while maintaining a speed of 60 kilometers per hour. Further, the vehicle slows down to under 20 kilometers per hour, without the driver's intervention, when a person in a zebra costume on skates suddenly runs in front of the vehicle, because the system recognizes both the object in front of the vehicle and its relative speed and position.[19]

---

[18] *See Subaru Lane Keep Assist – Why EyeSight?,* YOUTUBE (2020 Updated)*,* https://www.youtube.com/watch?v=iSKuxOImduI.

[19] *See TVC: Subaru's EyeSight Adaptive Cruise Control,* FACEBOOK (Aug. 19, 2019), https://www.facebook.com/ShootingGalleryAsia/videos/tvc-subaruseyesight-adaptive-cruise-control/2414147312163489/.

84.     In contrast to the glowing recommendations provided by Subaru in its advertisements, such as these videos, commercials, and brochures, the AEB and LKA systems in Class Vehicles activate without cause, startling drivers with alarms and lights, and applying the brakes or steering the vehicle in a way that is not safe for traffic. These actions can cause collisions when the Class Vehicles suddenly stop in the road or swerve into barriers or other vehicles. Conversely, the AEB systems frequently fail to activate when they are most needed—when obstacles or pedestrians suddenly appear in front of a vehicle and the driver requires assistance to avoid or mitigate a collision. Both the AEB systems and the LKA features are also prone to malfunctions—they turn off unexpectedly and may fail to turn on again until the vehicle is restarted.

85.     The Defects in Class Vehicles are caused by the poor calibration of the systems, including their cameras and sensors, and faulty programming of the system control modules (particularly their ability to decide when to command other control modules including, for example, the antilock brake system control module and the TCM to apply the brakes and stop the vehicle in the middle of traffic). Discovery will show that each supplier of the different vehicle components—the transmission, the brake system, etc.—has different software and provides a different electronic control module and/or software for their vehicle components. Integration of software and controls modules for system components is Subaru's responsibility. If those

systems are not properly integrated, the driver-assistance technology control modules may interfere with the normal operation of the vehicle in a dangerous manner. For Subaru vehicles, some of the control modules involved include the TCM, the ECM, and the Vehicle Dynamic Control ("VDC")[20] Module. Issues with these modules often have negative effects on the functionality of the driver assistance systems.

86.    Indeed, Subaru is aware that its systems are prone to malfunction and not ready to be driven in real-world situations. Despite the prominence of its marketing campaigns, Subaru acknowledges in booklets provided to consumers *after* they purchase their vehicles that the cameras and sensors may not function in inclement weather such as rain or snow, may not recognize patterns such as fences, and may not function in construction zones or other commonplace situations.[21] This is something that Subaru does not disclose before a customer purchases a vehicle.

87.    Moreover, these listed "system limitations" are not a fulsome recitation of all the real-world conditions that Subaru's Driver Assistance Technologies are ill-designed and inadequately calibrated to recognize, such as highway on- and off-ramps, conditions involving too much or too little sunlight, and driveways. Further,

---

[20] Vehicle Dynamic Control is the system that monitors driver input and road conditions and adjusts the system to help prevent slipping of the brakes or the drive wheel, or control brake pressure to correct oversteer or understeer.

[21] *See* SUBARU CORP., *supra* note 5.

these disclaimers also fail to acknowledge that the Driver Assistance Technologies often simply malfunction due to competing instructions and/or become disabled or unavailable. As a result, Plaintiffs and members of the Class have paid for a system that is defective and oftentimes simply inoperative.

88.     Subaru denies that any issues exist when Plaintiffs and members of the Class complain about them, and Subaru instructs its dealerships to tell consumers that their vehicles are functioning normally or can fail to function properly in normal, everyday conditions like rain. In some instances, the dealership has instructed Plaintiffs or members of the Class to "turn off" PCB and other driver-assistance features, despite the fact that the systems return to active configuration every time the vehicle is restarted.

89.     In part, this is because Subaru's network of dealers simply does not have the training or equipment to adjust the software in any vehicle, but instead must rely on Subaru and/or its suppliers to provide software patches. Often, the only instruction that Subaru has given its dealerships to address consumer complaints about the AEB system is to "reset" or "reboot" the relevant system control modules, or perform a sensor or camera replacement. However, since the programming of the system control module is insufficient to account for real-world driving conditions, this does not repair the Defects.

90. A 2024 rule from the National Highway Traffic Safety Administration (NHTSA) will require passenger vehicles, by September 2029, to have AEB systems that can avoid a crash at speeds of up to 62 mph, and brake at speeds of up to 90 mph, when a crash is imminent. It also requires vehicles to avoid a crash with a pedestrian at speeds of up to 45 mph, including in darkness.[22]

91. While this rule sets ambitious proscriptive standards for the future, in current practice commercial AEB systems have several different functional configurations and it is left to the discretion of the manufacturer to fill in the gaps.[23]

92. Consumer Report notes that "it's important to remember that AEB isn't foolproof and that today's AEB systems can't prevent all collisions. Even high-speed AEB systems can only slow a car down in some cases, mitigating a crash rather than preventing it."[24]

---

[22] *See* Keith Barry, *Automatic Emergency Braking with Pedestrian Detection to Become Mandatory on All New Cars,* CONSUMER REPORTS (Updated Apr. 30, 2024), https://www.consumerreports.org/cars/car-safety/aeb-with-pedestrian-detection-could-become-mandatory-a7468313823/.

[23] *See* Barry, *supra* note 1.

[24] *Id.*

93. In fact, the rule issued by "NHTSA is not outlining any specific equipment requirement, but rather new performance standards," allowing manufactures to use any equipment they desire to meet the standard.[25]

94. Despite the issuance of the rule, trade groups have pushed back on mandatory AEB adoption, noting that this "fix" can cause other problems such as: "unwarranted activations, false alarms and issues with controlling [vehicles] in inclement weather."[26]

95. Automakers also agree that current AEB systems are not fully optimized for real world conditions and that such systems can effectively "trade" certain bad outcomes for others. President and CEO of the Alliance for Automotive Innovation, John Bozzella, expressed concern that "[t]his rule requires vehicles to stop at high speeds. I'm talking highway speeds, 62 miles an hour, complete stop,

---

[25] *See* Justin Westbrook, *Full Stop: Feds Require Automatic Breaking for New Cars by 2029,* MOTORTREND (May 1, 2024), https://www.motortrend.com/news/nhtsa-regulates-automated-emergency-braking-safety-tech?eml=organic%3Aeml%3Abrz%3A20240502%3Anhtsa-regu%3Aarticle%3Anwsltr%3Aowcst%3Amt&utm_campaign=mtod_newsletter&utm_medium=email&utm_source=braze.

[26] *See* David Taube, *Regulators Propose Automatic Emergency Braking System Requirement for Heavy Trucks,* WARDSAUTO (June 26, 2023), https://www.wardsauto.com/news/archive-auto-fmcsa-aeb-proposed-rule-heavy-truck-vehicles/653837/.

zero contact . . . . My concern is that we are gonna trade avoidance of front-end collisions for an increase in rear-end collisions."[27]

96.    Indeed, many of the potential issues raised, including braking unnecessarily for parked cars or stationary objects in heavy traffic, are exactly the same issues that have been experienced by Plaintiffs and other drivers under real-world conditions.[28]

97.    So far, automakers like Subaru have not produced vehicles with AEB systems that perform consistently or predictably. While noting that manufacturers may include some warnings in owners' manuals, tests by *Car and Driver* revealed a shocking variation in results even in the same car. "Driving the same car toward the same target at the same speed multiple times often produces different results.

---

[27] *See* Lisa Fletcher, Andrea Nejman & Nathan Aaron, *Major Automotive Industry Group Raises Concern About Emergency Brake Requirements*, WNWO NEWS (Oct. 7, 2024), https://nbc24.com/news/spotlight-on-america/major-automotive-industry-group-raises-concern-about-automatic-emergency-brake-requirements-cars-highway-traffic-safety-lobbying-future-technology-politics-pedestrians-miles-per-hour.

[28] *See* Michael Brady, *Automakers Warn Automatic Emergency Braking Requirements Could Cause Crashes*, WARDSAUTO (AUG. 21, 2023), https://www.wardsauto.com/news/archive-auto-automakers-warn-automatic-emergency-braking-requirements-crashes-NHTSA-hyundai-porsche/691392/.

Sometimes the car executes a perfectly timed last-ditch panic stop. Other times it brakes late, or less forcefully, or even periodically fails to do anything at all."[29]

98.    Included in this testing was a Subaru Impreza which, like the other models tested, failed to perform predictably. "In our stationary-vehicle test, the Impreza's first run at 50 mph resulted in the hardest hit of the day, punting the inflatable target at 30 mph." [30] It was only on the second attempt that the Subaru's EyeSight system showed improvement.

### These Defects Pose an Unreasonable Safety Hazard

99.    These Defects cause unsafe conditions in the Class Vehicles, including, but not limited to, causing the vehicles to stop without cause in the middle of the road or unexpectedly in parking lots, veer into dividers, prevent drivers from changing lanes, distracting drivers with unnecessary warnings when no obstacles exist or if they are still in their lanes, incorrectly engaging the Lane Keep Assist feature, and/or failing to engage the braking system at all when the obstacles do appear in front of the vehicles. These issues increase the risk of collisions and/or fails to reduce the incidence and severity of collisions as these systems were designed to do.

---

[29] *See* Eric Tingwall, *We Crash Four Cars Repeatedly to Test the Latest Automatic Braking Safety Systems*, CAR AND DRIVER (Nov. 5, 2018), https://www.caranddriver.com/features/a24511826/safety-features-automaticbraking-system-tested-explained/.

[30] *Id.*

100.     More than 25 consumers have complained to NHTSA about this safety issue in Class Vehicles, including several complaints submitted prior to Plaintiffs' Vehicle purchases. A sampling is below:

**2022 Forester:**
https://www.nhtsa.gov/vehicle/2022/SUBARU/FORESTER/SUV/AWD

> **NHTSA ID Number:** 11683266
> **Incident Date:** June 14, 2025
> **Consumer Location:** OAK HARBOR, WA
> **Vehicle Identification Number:** JF2SKARC2NH******
> **Summary of Complaint**
> **Crash:NoFire:NoInjuries:0Deaths:0**
>
> Several months ago, the automatic front collision activated on the freeway doing about 65mph. There was nothing in front of us, but there was a car behind us that almost rear ended us. I thought this was a one-off thing but reading this site I am not the only one. Also, with in the last 2 weeks the Eye Site has turned off. This I see is also a known problem.
>
> **NHTSA ID Number:** 11648782
> **Incident Date:** March 14, 2025
> **Consumer Location:** SOUTHAMPTON, NY
> **Vehicle Identification Number:** JF2SKAEC1NH******
> **Summary of Complaint**
> **Crash:NoFire:NoInjuries:0Deaths:0**
>
> This happened to me a few days ago: The pre-collision braking system slammed my car to a stop when I was going 30 mph on a straight country road, and there was nothing in front of me or on the side of the road. No one anywhere around. It was 1 PM with good weather. Nothing to trigger the pre-collision braking system on my 2022 Forester. The sensors weren't dirty. The car suddenly slammed on the brakes. It felt like I'd slammed into something, but nothing was there! There was nothing anywhere around. I turned off the pre-collision feature and took the car to the dealer (where I bought the car and have it serviced). Cost me $135 to be told that there was nothing wrong. And they said that my extended warranty wouldn't cover the cost because they didn't find anything wrong and couldn't make it happen in a test drive. Having

34

the brakes slam on like that was terrifying! Imagine if I'd been on a highway and there had been someone behind me. They would have rear-ended me! And I've read MANY, MANY similar accounts by Subaru owners on Reddit and the Subaru owners forum. Please do something about this. It's dangerous! Thank you!

**NHTSA ID Number:** 11542195
**Incident Date:** August 25, 2023
**Consumer Location:** NAPLES, FL
**Vehicle Identification Number:** JF2SKAMC8NH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

On 22 and 25 August my vehicle came to an abrupt stop with a Pre Collision Braking Displayed in a rectangular box in the center of my dash. The hard breaking and warning display happened for only 1-2 seconds. There were no driver or passenger physical injuries other than being startled and upset with the vehicle coming to such an abrupt stop with no other vehicles, debris, or obstructions on the roadway. After both incidents, I drove straight to the nearby Subaru dealership to have this problem diagnosed and repaired . Both times the vehicle checked out fine. I told the service manager that the vehicle is unsafe and puts me at risk especially for a rear end collision or a possible whiplash injury for me and any passengers. Two Pre Collision Braking events in one week is not acceptable. They agreed to contact their company's engineers for further action.

**NHTSA ID Number:** 11633546
**Incident Date:** December 1, 2024
**Consumer Location:** PORTLAND, OR
**Vehicle Identification Number:** JF2SKARC6NH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I was driving with adapative cruise on a highway around 65 mph. I can only assume it did a sudden and rapid slow down on its own due fairly defined shadows on the road from tall rocks/cliffs on the side of the road. Luckily I was the only one on the road at the time. It was a clear sunny day. This to me is pretty unsafe if there had been other cars. I have made a service appointment about the issue as well a head unit that is very glitchy

35

**NHTSA ID Number:** 11534026
**Incident Date:** July 23, 2023
**Consumer Location:** SOUTH MILWAUKEE, WI
**Vehicle Identification Number:** JF2SKALC0NH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

While driving home from vacation (07/23/2023), we were on the freeway. My 3 young children were in the back seat. We were going about 75-80MPH, as the speed limit was 70MPH on the highway. My cruise control was NOT on , and there were no cars in front of us. However the collision breaking went off and it put the breaks down HARD. My kids all went flying forward causing the seatbelts to lock along with me and my husband being thrown forward (we were also wearing seatbelts). As scary as that is, the worst part was there was a very large truck behind us who almost slammed into the back of us. Thankfully he swerved and went into the grass to avoid hitting us. However it continued to break until we were down to about 40MPH. The whole time the car was alarming and flashing the warning of collision breaking on the dash. There had been no warnings or any issues prior to the braking system going off. There hadn't previously been any hard stops, no crazy bumps or potholes in the road that had been hit. There was no indication of there being any issues before it randomly started breaking for me. I have called Subaru about the problem, and plan to bring it in to be inspected this week. Otherwise, my car is 100% up to date on all inspections and all vehicle maintenance.

**NHTSA ID Number:** 11528910
**Incident Date:** June 24, 2023
**Consumer Location:** CLEARWATER, FL
**Vehicle Identification Number:** JF2SKARC9NH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

While driving on interstate 75 north in Florida, the forward collision warning came on indicating something in the road. The system brought the vehicle to a dead stop on the highway and there was nothing in the road. This happened 4 times! We figured out how to disable eyesight and the forward collision system. The weather was clear and sunny. We drove in and out of shaded road. We were able to disable the eyesight and front end collision system and continue our trip.

36

**NHTSA ID Number:** 11475307
**Incident Date:** July 22, 2022
**Consumer Location:** VILLAS, NJ
**Vehicle Identification Number:** JF2SKARC5NH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

The contact owns a 2022 Subaru Forester. The contact stated that while driving 20 MPH, the vehicle experienced phantom braking. The vehicle was taken to the dealer where it was diagnosed; however, no fault codes were retrieved. The vehicle returned to operating as designed. The vehicle was not repaired. The manufacturer was not made aware of the failure. The failure mileage was approximately 250.

**2023 Forester:**
https://www.nhtsa.gov/vehicle/2023/SUBARU/FORESTER/SUV/AWD

**NHTSA ID Number:** 11706572
**Incident Date:** December 20, 2025
**Consumer Location:** KANEOHE, HI
**Vehicle Identification Number:** JF2SKAMC7PH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

In three years I've had the Automatic Emergency Braking system engage and almost cause accidents several times. The breaking system engages when it's not needed. Going down a road driving straight at 25 MPH, no obstacles in road and breaks engage. Verry scarry, what if I was going 65 MPH on the highway! Another incident was on an off ramp in a curve, and another making a U-turn. This is not ok!

**NHTSA ID Number:** 11670232
**Incident Date:** June 25, 2025
**Consumer Location:** BAKERSFIELD, CA
**Vehicle Identification Number:** JF2SKAEC3PH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

In driving our 2023 Subaru Forester at 45mph at 10:00 am in the morning, with NO cars in front of us, in back of us, or on either side of us- suddenly the brakes locked up! Had there been anyone behind us, there could have been a

dangerous collision. We have owned this car for 2 years, done all maintenance on it, and have NEVER had this happen before. We feel unsafe driving it now. We pulled the car over, got out to look under the car, thinking maybe we hit something in the road...but there was nothing...no warning....we contacted Subaru corporate, was given a Case number, but are still waiting to hear from them.

**NHTSA ID Number:** 11625984
**Incident Date:** November 15, 2024
**Consumer Location:** SKYFOREST, CA
**Vehicle Identification Number:** JF2SKAJC4PH******
**Summary of Complaint**
**Crash:YesFire:NoInjuries:1Deaths:0**

I was driving on a two lane highway in the mountains and came around a small right-veering turn in the road. I straightened out the wheel to resume traveling straight, and my car's auto-steer kicked in and pulled left into the center divider, and then right across two lanes and crashed into the side of the mountain. The auto-steer has pulled me out of lanes prior to this incident as well.

**NHTSA ID Number:** 11602395
**Incident Date:** June 30, 2024
**Consumer Location:** HUDSON, WI
**Vehicle Identification Number:** JF2SKAEC8PH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I was driving down the main street of a small city. There is a decent amount of traffic, so I'm not sure what speed I was going but likely no more than 25 mph. All of a sudden, for no apparent reason, the pre-collision braking went into effect and slammed me to a total stop. I wasn't too close to the vehicle in front of me, there were no pedestrians in the road, etc. thankfully the vehicle behind me was able to stop and did not hit me. I was able to move forward and pulled into the closet parking lot. I looked and could see anything directly on my vehicle. Subaru is saying that one of my tire's pressure was low and that may have caused it or sunlight may have caused it. There was no low tire pressure light on my vehicle. The light had been on not too long before this and I had filled the tires. But no warning light on the day this happened. I was able to successfully drive further with no issues. Subaru does not seem to be

38

taking this seriously. But, no matter the cause, if either of these things will cause a vehicle to come to an immediate stop, that is definitely a safety issue. And it is a safety concern that should be looked into.

**NHTSA ID Number:** 11595249
**Incident Date:** June 19, 2024
**Consumer Location:** STERLING, CT
**Vehicle Identification Number:** JF2SKAPC5PH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

We were traveling on a limited access highway at approximately 65 miles an hour. Both the adaptive cruise control and the driver assist were engaged. A car approximately four car lengths ahead of us exited the highway into the breakdown lane. My car slammed on its brakes and reduced speed to less than 40 miles an hour with no warning. Had there been a vehicle behind us we certainly would have been hit. This is not the first time we have had difficulty with the adaptive cruise control braking unpredictably , but it's the first time it endangered our lives.

**NHTSA ID Number:** 11523158
**Incident Date:** May 12, 2023
**Consumer Location:** TRAVELERS REST, SC
**Vehicle Identification Number:** JF2SKAPC6PH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

Forward collision braking activated for no reason. No traffic in front or behind when activated. Steady speed of 35-40 mph when activated - conditions were clear and dry. No warning prior to incident, message appeared on dash during braking. Seat belts activated and car came to a complete and very abrupt stop. Thankfully no vehicle behind us or most likely would have been rear ended. Problem has not been reproduced as we will not drive the vehicle without disabling the Forward Collision feature on the car. Vehicle had less than 2500 miles on it when incident occurred. Vehicle has not been to the dealer for inspection yet but will have them check the Forward collision system at first oil change service unless requested sooner. Emailed Subaru customer service to notify them of the incident.

39

**2025 Forester:**
https://www.nhtsa.gov/vehicle/2025/SUBARU/FORESTER/SUV/AWD

**NHTSA ID Number:** 11728521
**Incident Date:** November 19, 2025
**Consumer Location:** WEST HURLEY, NY
**Vehicle Identification Number:** JF2SLDTC4SH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I experienced a false emergency braking event twice at the same area near my home. The vehicle falsely identified a stopped car ahead of me and slammed on the brakes, with a loud beeping noise and flashing lights. Fortunately, there was no one behind me, or they would have probably collided with my vehicle. The same series of events happened a second time at the same place. I was on [XXX] heading west, where a left turn lane appears at [XXX] . Both times there was a vehicle in front of me that turned left into the exit lane when I was using cruise control. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**NHTSA ID Number:** 11701420
**Incident Date:** June 21, 2025
**Consumer Location:** PLEASANT GROVE, UT
**Vehicle Identification Number:** JF2SLDDC2SH******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I have a 2025 Forester. The new Forester has unexpectedly thrown on its brakes in a major way three times in 24,000 miles. The last incident was on a divided highway with a sweeping curve to the right. There were orange barrels closing off the lane to the left of me in the curve for maintenance work. In the middle of the curve to the right, the eyesight system saw the orange barrels in the other lane as a threat and unexpectedly threw on the brakes. I had concerns about being rear ended. I am reporting this because internet Subaru Forester blogs and facebook groups all have owners reporting the same dangerous issue.

**2022 WRX:**

https://www.nhtsa.gov/vehicle/2022/SUBARU/WRX/4%252520DR/AWD

**NHTSA ID Number:** 11634566
**Incident Date:** February 6, 2024
**Consumer Location:** ARLINGTON, MA
**Vehicle Identification Number:** JF1VBAN61N8******
**Summary of Complaint**
**Crash:NoFire:No<span style="color:red">Injuries:0Deaths:0</span>**

During driving, especially when it is cold outside, the Subaru Eyesight Pre-Collision system (automatic emergency braking) can be triggered by exhaust smoke from a vehicle in front of it. The braking system can be falsely activated, which could cause your vehicle to be hit from behind. There is no way to adjust the sensitivity of this system. It is only meant to be activated by objects, but since the system is camera-based it might think that a large cloud of exhaust is actually solid. In the specific instance when this happened, I was waiting at a red light behind a GMC Acadia. When the light turned green, a lot of exhaust came from that car, and the pre-collision braking was activated, causing the car to activate the brakes very abruptly. At the next light, the same thing happened, but the car didn't hit the brakes that time since I lifted off the accelerator, but the warning buzzer still activated. Video showing the problem: [XXX] The loud grinding noise after the pre-collision warning beeps is the sound of the brakes when they are applied by pre-collision. What component or system failed or malfunctioned, and is it available for inspection upon request? Pre-collision prevention How was your safety or the safety of others put at risk? Vehicle can stop unexpectedly which could cause a rear-end collision. Has the problem been reproduced or confirmed by a dealer or independent service center? No. Has the vehicle or component been inspected by the manufacturer, police, insurance representatives or others? No. Were there any warning lamps, messages or other symptoms of the problem prior to the failure, and when did they first appear? No. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**2024 WRX:**

https://www.nhtsa.gov/vehicle/2024/SUBARU/WRX/4%252520DR/AWD

**NHTSA ID Number:** 11691100
**Incident Date:** September 26, 2025

41

**Consumer Location:** BERGENFIELD, NJ
**Vehicle Identification Number:** JF1VBAY66R9******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

I understand that every manufacturer is racing to get these vehicles autonomous or something similar to it and I can fully appreciate a world that would be as I'm sick of distracted drivers as it is these days and the police's complicity or the lack of enforcement doesn't help. That said, the pre-collision system in Subaru needs a bit of an overhaul or an option to shut it off permanently and not every single time we start the vehicle. There were two separate instances where the collision warning picked up "something" that caused it to brake unexpectedly and hard causing ABS to trigger and everything getting thrown off the seats. I have no idea what even caused it. One other instance is when the vehicle in front of me suddenly braked unexpectedly. Seeing as I do not tailgate, I had plenty of time to move over to the other lane. In the process of this, the car detected the braking vehicle in front and just slammed the pre-collision brakes on me causing all sorts of panic for myself and every driver around me. The car tried to stop on the parkway at 55 mph because I wanted to merge left (and had plenty of space to do so) whereas the car just wanted to stop. The lane I was merging to didn't have anyone so it was fine but the person behind me probably freaked out a bit. Subaru needs to give us the ability to adjust the sensativity of these systems or just the ability to turn them off permanently. I love this car and love the brand but I feel they could do better. I'd like to say these manufacturers need to stop trying to baby and coddle us but when I see the drivers these days, I can understand where they are coming from.

## 2024 Crosstrek:
https://www.nhtsa.gov/vehicle/2024/SUBARU/CROSSTREK/SW/AWD

**NHTSA ID Number:** 11707689
**Incident Date:** November 10, 2025
**Consumer Location:** BALLWIN, MO
**Vehicle Identification Number:** 4S4GUHL67R3******
**Summary of Complaint**
**Crash:YesFire:NoInjuries:1Deaths:0**

The 2024 Subaru Crosstrek brakes engaged TWICE without the driver pushing on the brakes, slowing the car down significantly. The initial vehicle

speed was around 65 mph on the highway, and slowed to around 45 mph after the second automatic braking incident occurred. Adaptive cruise control was NOT on. The car in front of the Crosstrek was 8-10 car lengths away. Then while the Crosstrek was still moving, a truck hit the back right bumper of the Crosstrek and pushed it into the next lane to the left. (I), the driver of the Crosstrek, was able to steer back into the original lane of travel to the right. After the Crosstrek was steered back to the original lane of travel, it came to a stop due to right rear axle damage. The Crosstrek driver was able to creep to the shoulder to wait for emergency personnel to arrive. The safety of myself and others, due to the Crosstrek (Eyesight?) malfunction, is extremely important to investigate. This safety feature when engaged unexpectedly is dangerous. When drivers do not have control over the braking system of the car, sudden and unexpected slow-downs can lead to rear-end accidents, and even the loss of life. When I was pushed to another lane of travel, a secondary accident could have occurred, or a chain-reaction with many cars. I did not see or hear any warnings, messages, or experience any unusual symptoms before the car braked on its own and I was rear-ended. After I crept to the right shoulder of the interstate, the Crosstrek was still running and there were no warnings or messages. Since the Nov 11 accident, Dean Team Dealership in Ballwin MO has reported the issue. State Farm Insurance has totaled the 24 Subaru Crosstrek, recovered data from the Event Date Recorder (EDR), and is discussing the vehicle losses with Subaru Corporation. [XXX] is receiving chiropractic care also. Additionally, there similar reported incidents on websites—Reddit and [XXX] . INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**NHTSA ID Number:** 11700419
**Incident Date:** November 14, 2025
**Consumer Location:** KENSINGTON, CA
**Vehicle Identification Number:** 4S4GUHN6XR3******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

Automatic braking: One incident of the automatic braking system engaging on a side street when the road was clear of obstacles. The road surface had been prepared for some kind of minor work in the center of the road - there were regularly intermittent disturbances to the otherwise smooth surface. These appeared to be small prox 6-8" square cuts in the surface. On two occasions the car braked suddenly and sharply in front of these disturbed areas. Potential risk from a following car.. Steep, windy road with cars parked

on either side. Weather clear. I have not yet reported this to the dealer so it has not yet been inspected. I did not notice any other signs or warning systems prior to this event and during the event I was distracted by the event itself and too busy looking for vehicles that might hit me from behind, etc. to notice.

**NHTSA ID Number:** 11584902
**Incident Date:** April 24, 2024
**Consumer Location:** WIXOM, MI
**Vehicle Identification Number:** 4S4GUHL65R3******
**Summary of Complaint**
**Crash:NoFire:No<span style="color:red">Injuries:</span>0Deaths:0**

While making a left turn out of a parking lot, across one lane of the two-lane road to the middle left-hand turn lane of the traffic signal, the car cut power and issued an alert (which I could only hear - not see due to the urgency of the situation) causing me to almost get t-boned by traffic in the lane that I was crossing. I think the car sensed the stopped traffic I was facing, and the car didn't realize I was turning left, and "thought" I was going to collide with the stopped traffic, engaging the pre-collision braking system, which was not correct for the situation and almost caused a crash. There is no way to have a dealer verify the issue as it was just situational. There was an emergency warning issued both on the dash (which I couldn't see due to the urgency of the situation) and an auditory alarm (which I heard as the car cut power to the engine).

**NHTSA ID Number:** 11566225
**Incident Date:** December 21, 2023
**Consumer Location:** LAS VEGAS, NV
**Vehicle Identification Number:** 4S4GUHL63R3******
**Summary of Complaint**
**Crash:NoFire:No<span style="color:red">Injuries:</span>0Deaths:0**

On 12/21/23 at approximately 9:19am PST, I was driving [XXX] away from the intersection of [XXX]. This is a divided four lane road (two lanes in either direction). While driving on a winding section of road divided by pillars, my forward collision detection and automatic braking systems erroneously activated when there were no cars or objects in front of me. My dashboard displayed a pre-collision braking warning message and there was a loud beeping alarm. My vehicle rapidly and unexpectedly decelerated. Another driver was following closely behind me when my car rapidly and

44

unexpectedly decelerated. This could've caused the driver behind me to rear end me. Also, at various points in the past the forward collision detection system has at time alarmed erroneously without activating the brakes, even when there are no cars in front of me or said cars were very far in front of me and there was no risk of collision. I reported to incident to Subaru and made a service appointment for the issue on 1/18/2024. The Service Advisor advised me that the system has been known to produce false positives. He advised me to disable the pre-collision braking system on windy roads, where the system may incorrectly detect that the car is about to collide with static objects in the median, especially if those objects are reflective. No further service or inspection was performed related to these issues on 1/18/24. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**NHTSA ID Number:** 11553656
**Incident Date:** October 23, 2023
**Consumer Location:** ORLANDO, FL
**Vehicle Identification Number:** JF2GUADC4RH******
**Summary of Complaint**
**Crash:NoFire:No<span style="color:red">Injuries:</span>0Deaths:0**

Pre-collision braking has deployed a number of times without cause (no one in front of vehicle, no collision threat at all. Most recently at 35mph, but at up to 55 mph prior. Feel free to inspect. - Brakes are automatically deployed HARD and without the warning that is supposed to occur. This has thrown me into the seatbelt a few times and poses a significant risk of getting rear ended. I'm afraid the automatic steering system is going to throw me into a ditch. - The dealer can't reproduce it and no log is recorded by the car because it isn't registered as a malfunction, rather the vehicle thinks it's doing the right thing. I've taken it in twice for this and a few other issues. - The vehicle has not been inspected by anyone else as there has been no damage yet. - No signals were given and there have been no other symptoms other than the adaptive cruise control slowing down for no reason on occasion, presumably it thinks there are ghost cars in front of me?

### 2025 Crosstrek:
https://www.nhtsa.gov/vehicle/2025/SUBARU/CROSSTREK/SW/AWD

**NHTSA ID Number:** 11720394
**Incident Date:** February 25, 2026

**Consumer Location:** VESTAVIA HILLS, AL
**Vehicle Identification Number:** JF2GUHDC6S8******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

This a second report following a visit to the dealer for system check. At that service, we were advised that no issues were identified, we were told that sunlight could cause the Subaru "EyeSight" system to disengage. Today, 25 February, the vehicle EyeSight system continues to disable and enable itself seemingly at random. This morning, we travelled on well marked roadways with overcast skies (no sunlight to cause problems). The system repeatedly disabled and enabled itself. In addition, on a street with vehicles parallel parked along the curb, the vehicle reported an obstacle and began braking for no apparent reason. This has been reported to the dealer. We are awaiting a response. It does seem as if there are some faults within the EyeSight system.

**NHTSA ID Number:** 11724288
**Incident Date:** March 4, 2026
**Consumer Location:** VESTAVIA HILLS, AL
**Vehicle Identification Number:** JF2GUHDC6S8******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

On two occasions, the vehicle has activated the forward collision warning although there was no nearby vehicle or obstruction. The date of incident is not precise.

**2024 Impreza:**
https://www.nhtsa.gov/vehicle/2024/SUBARU/IMPREZA/SW/AWD

**NHTSA ID Number:** 11675427
**Incident Date:** July 15, 2025
**Consumer Location:** LAKEBAY, WA
**Vehicle Identification Number:** JF1GUABC6R8******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

Unnecessary braking in two instances. One happened when Subarus Eyesight system mis identified a road reflector. At least that is what I saw. It happened on a 40 mile an hour highway in a curve with moderate traffic. No one directly

46

behind me. The car had a sudden deceleration and warning. The second time came when approaching freeway speeds on an on ramp. At heavy acceleration approaching 50 miles per hour the car violently slammed on the brakes. A shadow from a tall fir tree crossed the on ramp. Again no one was behind me. It can't be good for my new car.

**NHTSA ID Number:** 11631918
**Incident Date:** December 20, 2024
**Consumer Location:** MIDLOTHIAN, VA
**Vehicle Identification Number:** JF1GUABCXR8******
**Summary of Complaint**
**Crash:NoFire:NoInjuries:0Deaths:0**

Car braked suddenly and violently while driving slowly (5-10 MPH) in traffic. Foot was on the gas pressing lightly - not on the brake. Braking occurred independently with such force that I thought I had been hit by another vehicle going 30-40 MPH. Hyman Bros. Subaru has not yet returned my calls regarding this incident.

101. In fact, complaints were so prevalent about the AEB system malfunctions in Subaru models, among other vehicles, that NHTSA opened an investigation into AEB systems in 2019.[31]

102. Complaints posted by consumers to online forums also demonstrate that the Defects are widespread and dangerous and that they manifest without warning. The complaints also indicate Defendant's awareness of the problems with these systems and how potentially dangerous the Defects are for consumers.

---

[31] See Ben Foldy, *As Automatic Braking Becomes More Common in Cars, So Do Driver Complaints*, THE WALL STREET JOURNAL (Aug. 27, 2019), https://www.wsj.com/articles/as-automatic-brakes-become-common-so-do-drivercomplaints-11566898205.

103.   One Reddit user in 2025 noted:

I was driving with my wife and saw a cyclist coming from an intersection to the right. I didn't think of it too much since there is a designated bike lane, but I let my foot off the gas just in case I needed to break. Suddenly the car jerked to a stop with ABS kicking in and alarms, preventing me from continuing to drive for about 2 seconds afterwards. There was a car following pretty close behind me and I'm 100% their safety features kicked in and it's honestly a surprise we weren't hit.[32]

104.   Other drivers in the same thread noted similar issues such as braking unnecessarily due to shadows in the road, braking for parked cars, and other stationary objects (such as powerlines), and activating due to plastic bags in the roadway.[33]

105.   Another owner of a 2025 Subaru Outback complained on Facebook that an EyeSight failure had caused the vehicle to stop running while driving on the highway.[34]

106.   Another Reddit user and 2024 Subaru Forester owner complained that the EyeSight system in his vehicle "seems to disable itself randomly for a bit and

---

[32] *See* @_Artrex, REDDIT (July 6, 2025), https://www.reddit.com/r/Subaru_Outback/comments/1lt83hn/is_there_a_way_to_tone_down_the_eyesight_safety/ (last visited May 9, 2026).

[33] *Id.*

[34] Justin Bacuetes, *Subaru Outback Enthusiast,* FACEBOOK (June 16, 2025), https://www.facebook.com/groups/1439208566149446/posts/30021842134126041/ (last visited May 9, 2026).

then comes back on without any input from me" and that such issues did not appear to be caused by inclement weather or other environmental issues.[35]

107. The Defects pose an unreasonable safety risk for members of the Classes and other drivers, are safety hazards to the general public, and increase the risk of automobile accidents.

**Subaru Had Superior and Exclusive Knowledge of the Defects**

108. Subaru had superior and exclusive knowledge of the Defects and knew or should have known that the Defects were not known or reasonably discoverable by Plaintiffs and members of the Class before they purchased or leased the Class Vehicles.

109. Discovery will show that before Plaintiffs purchased or leased their vehicles, since at least 2012, Subaru knew about the Defects through sources not available to consumers, including the following: pre-release testing data; information from its Quality Monitoring Teams; early consumer complaints about the Defects to Defendant's dealers who are their agents for vehicle repairs; warranty claims data related to the Defects; aggregate data from dealers; consumer complaints to NHTSA and resulting notice from NHTSA; early consumer complaints on websites and internet forums; data from the Starlink system in consumers' vehicles;

---

[35] *See* @nazgulc, REDDIT (Dec. 1, 2024),
https://www.reddit.com/r/SubaruForester/comments/1h3wcws/subaru_eyesight_ra
ndomly_disabling_is_this_common/ (last visited May 9, 2026).

dealership repair orders; testing conducted in response to owner or lessee complaints; reports from Subaru's Ambassadors; quality control audits; and other internal sources of aggregate information about the problems.

110. Subaru's internal consumer relations department and/or online reputation management services, including Subaru's Ambassadors, acting on Subaru's behalf, routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites. These posts describe the defects at issue here. *See generally* Paragraphs 92-96 *supra.* The fact that so many customers made similar complaints put Subaru on notice, no later than 2016, that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the Class Vehicles.

111. Likewise, since 2012, if not earlier, Defendant has also constantly tracked the NHTSA database to track reports of false activations with AEB systems and malfunctions of the LKA in Subaru cars. From this source, Defendant would have known that the Class Vehicles were experiencing unusually high levels of false activations and malfunctions. Defendant has and continues to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five days of learning of them. *See* Reporting of Information and Documents About Potential Defects Retention of Records That Could Indicate Defects for NHTSA, 67 Fed. Reg. 45822 (July 10, 2002) (amending 49 U.S.C. §

50

30166(e) (1994))[36]. Therefore, Defendant monitors the NHTSA–ODI website and the complaints filed therein in order to comply with their reporting obligations under federal law, and thus, had knowledge of the Defect.

112.    Subaru issues TSBs and Technical Tip newsletter bulletins, among other communications, to its dealers in order to provide instructions on how to repair Subaru vehicles or respond to particular consumer complaints. These communications standardize service throughout Subaru's agent dealership network, are explicitly not meant for consumer review, and often have a prohibition on them against printing them out. Indeed, it was only in 2012 that it became a requirement for manufacturers to provide NHTSA with a copy of these manufacturer communications. Further, these communications often do not reveal the cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand. Moreover, some of these communications were issued "in the interest of customer satisfaction," which is language that Subaru often uses to indicate to its dealerships that the bulletin was drafted in response to consumer complaints.

113.    On September 21, 2012, Subaru issued a TSB entitled "EyeSight Acceptable Windshield Repair Areas." This TSB was applicable to the very first vehicles with EyeSight, the 2013 Legacy and Outback vehicles. It was later revised

---

[36] https://www.govinfo.gov/content/pkg/FR-2002-07-10/pdf/02-17103.pdf.

on August 5, 2013, to be applicable to later model years as well. The TSB instructed dealerships on the areas of the windshield where no repairs could be attempted and, as such, a full window replacement would be necessary because repairs in these areas would interfere with the EyeSight stereo camera and compromise the operation of the system. Later in the TSB, Subaru cautioned against using "glossy backed" labels, stickers, or decals, which could create glare that would interfere with the EyeSight system operation.

114.    On September 21, 2012, Subaru also issued a TSB entitled "ETC (Electronic Toll Collection) Device Mounting Guidelines." This TSB was applicable to the very first vehicles with EyeSight (i.e., the 2013 Legacy and Outback vehicles). It was later revised on August 5, 2013, to be applicable to later model years as well. This TSB advised dealerships about the proper position of ETC devices, such as EZ-Pass, to ensure they did not interfere with the EyeSight's functioning. The TSB also cautioned that GPS receivers or radar detectors could not be placed in the central zone of the dash because their physical reflection and/or the light emitted from them could reflect on the windshield and interfere with the EyeSight stereo camera.

115.    On June 30, 2015, Subaru issued a Product Campaign Bulletin announcing a recall of certain 2015 model year Legacy, Outback, Impreza, and Crosstrek vehicles, and certain 2016 model year WRX vehicles, due to problems with the EyeSight system. As described by the bulletin:

The programming of the Driver Assist System will not detect a fault in the associated system components. In the event of a Brake Lamp Switch (BLS) failure, the Vehicle Dynamic Control (VDC) correctly detects the BLS failure, but the Driver Assist System will be delayed in detecting the BLS failure. Therefore, it will take longer for the multi-information displays to inform the driver of a malfunction. In addition, the VDC will not receive the brake request from the Driver Assist System, resulting in no automatic braking, including Adaptive Cruise Control and Pre-Collision Braking.[37]

The repair was to reprogram the Driver Assist System.

116.   On December 7, 2015, Subaru issued a TSB entitled "EyeSight System Cancel Code 60-ACH." The TSB was applicable to 2016 Forester vehicles with EyeSight. When addressing customer complaints about the system, the TSB instructed dealerships that Cancel Code 60-A0H had no effect on the EyeSight system, which is detected each time the ignition key is switched off. However, later in the same TSB, Subaru informed dealerships that "[i]n a case where the only Cancel Code displayed is 60-A0H, and no Camera Temporary Stop Count are displayed, there is a remote chance Cancel Code 65-C0H may be the cause as it will set in the rare instance when EyeSight's pre-collision secondary braking function is active 3 times during a single key cycle."[38] These codes could also be generated by

---

[37] SUBARU OF AM., INC., *WQS-54 Driver Assist System (EyeSight) Delay in Warning Indicator*, TSB No. WQS-54 (June 30, 2015), https://static.nhtsa.gov/odi/tsbs/2015/MC-10140559-9999.pdf.

[38] SUBARU OF AM., INC., *EyeSight System Cancel Code 60-A0H*, TSB No. 07-102-15 (Dec. 7, 2015), https://static.nhtsa.gov/odi/tsbs/2015/SB-10094228-2280.pdf.

Temporary Stop Counts, or issues with EyeSight camera, including: backlight; dirty, fogged, or frosted window glass; oil film on the window glass; raindrop adhering to the window glass; fingerprint adhering to the lens; deteriorated wiper; front of the camera is blocked by hand; object on the dashboard reflected against the windshield glass; bad weather (e.g., heavy rain, snowstorm, dense fog, etc.); unpatterned wall; water drop raised by preceding vehicle; steep slope; banner; grass; or preceding vehicles with large uneven surface, such as a trailer, or driving in the night without illuminating the tail light.[39] Some of the issues noted here are not provided to consumers, particularly as to "deteriorated wiper," "grass," or "preceding vehicle with … trailer."

117.   On October 19, 2018, Subaru issued a TSB entitled "DTC C0075-Additional Diagnostic Procedures."[40] This TSB was applicable to 2013-2014 Legacy and Outback vehicles with EyeSight, 2015-2016 Impreza vehicles with EyeSight, and 2015-2017 Crosstrek vehicles with EyeSight. The TSB directed dealerships to perform additional diagnostics when diagnosing a DTC C0075: WHEEL CYLINDER PRESSURE SENSOR OUTPUT on the EyeSight equipped models

---

[39] *Subaru Crosstrek Service Manual List – EyeSight Temporary Code(s) Display,* https://www.subaruxvforum.com/attachments/subaru-crosstrek-service-manual-list-eyesight-temporary-code-s-display-pdf.324193/ (last visited May 9, 2026).

[40] SUBARU OF AM., INC., *DTC C0075 – Additional Diagnostic Procedures,* TSB No. 06-67-18 (Oct. 19, 2018), https://static.nhtsa.gov/odi/tsbs/2018/MC-10150919-9999.pdf.

listed above…The additional diagnostics are intended to reduce unnecessary replacement of the Hydraulic Unit (H/U) Assembly." Other potential causes of a difference between the right and left wheel cylinder pressure sensor signal values had to be ruled out, and the procedures involved included performing ABS Sequence Control and VDC Sequence Control procedures.

118.    On July 29, 2019, Subaru issued a TSB entitled "Rattle Sound from EyeSight Camera Cover Design Change."[41] This TSB was applicable to 2019 Forester vehicles and announced two design changes to the EyeSight camera cover to prevent a rattling sound heard while driving.

119.    On August 15, 2019, Subaru issued a TSB entitled "DTC B280B EyeSight Camera Reprogramming File Availability."[42] This TSB was applicable to 2015 Impreza, Crosstrek, Legacy, and Outback vehicles. It announced to dealers the "availability of reprogramming files to optimize the EyeSight camera unit. In some cases, when using the Adaptive Cruise Control feature, the EyeSight system may stop functioning, enter a fail-safe mode and store DTC B280B- VDC ABNORMAL.

---

[41] SUBARU OF AM., INC., *Rattle Sound from EyeSight Camera Cover – Design Change,* TSB No. 12-269-19 (July 29, 2019), https://www.subaruforester.org/attachments/12-269-19-mc-10163562-0001-pdf.589694/.

[42] SUBARU OF AM., INC., *DTC B280B – EyeSight Camera Reprogramming File Availability,* TSB No. 07-158-19 (Aug. 15, 2019), https://static.nhtsa.gov/odi/tsbs/2019/MC-10164190-0001.pdf

When the EyeSight system is inoperative, the vehicle operates like a traditional vehicle not equipped with this feature. Normal EyeSight function is restored after cycling the ignition off and back on again." The dealers were directed to reprogram the EyeSight Camera. This TSB was subsequently revised and reissued on February 21, 2020, for the same condition, again directing the dealerships to reprogram the EyeSight Camera in 2015 Impreza, Crosstrek, Legacy and Outback vehicles.

120. On December 13, 2019, Subaru issued a TSB entitled "ECM Reprogramming for DTC C1424," originally issued on December 10, 2019. The TSB was applicable to 2019-2010 Ascent and 2020 Legacy and Outback vehicles. The TSB informed dealerships "[i]n the interest of customer satisfaction" that a service campaign is being initiated to reprogram the Engine Control Module (ECM). "In some vehicles, the current software may cause the sub learning value control to operate improperly during the wake-up mode of the ECM. This could cause repeated erroneous learning of the accelerate position which can result in the disabling of the VDC function. When the VDC function is disabled, EyeSight, Reverse Automatic Braking (RAB), and Electronic Parking Brake (EPB) auto release functions are disabled by the VDC fail signal causing the VDC, EyeSight, RAB and EPB warning

lamps to illuminate."[43] Dealers were directed to reprogram the ECM of approximately 115,729 vehicles.

121. On January 28, 2020, Subaru revised an earlier-issued TSB entitled "EyeSight / Lane Departure Deactivate DTCs."[44] The TSB was applicable to 2020 Legacy, Outback, Impreza, and Ascent vehicles, and 2019 Forester and Crosstrek vehicles. The TSB described the process for EyeSight system diagnosis when "specific DTCs relating to the Lane Departure Prevention function are not found in the applicable Service Manual." The TSB instructed dealerships that certain "Specific Lane Departure Prevention Deactivate Codes (a.k.a. "Stop Codes")" do not indicate the malfunctions in the EyeSight system and do not require further diagnosis. These stop codes include "2D Lateral Acceleration is Large" and "2E Lane Recognition Prohibition (Environmental Factor)." These stop codes were programmed into the EyeSight system to cancel the Lane Departure Prevention function during normal operations and suggest that they were programmed into the system to prevent the LKA feature from activating improperly in response to real-world conditions.

---

[43] SUBARU OF AM., INC., *Subarunet Announcement,* TSB No. WUU-06, (Dec. 10, 2019)*,* https://static.nhtsa.gov/odi/tsbs/2019/MC-10169872-0001.pdf.

[44] SUBARU OF AM., INC., *EyeSight / Lane Departure Deactivate DTCs,* TSB No. 07-165-20R (Revised Jan. 28, 2020), https://static.nhtsa.gov/odi/tsbs/2020/MC-10171083-0001.pdf.

122. On February 21, 2020, Subaru issued a TSB entitled "Reprogramming File Availability for EyeSight DTC B280B: VDC Abnormal."[45] The TSB was applicable to 2013-2015 Legacy and Outback vehicles, and 2015 Impreza and Crosstrek vehicles. The bulletin announced to dealers the availability of reprogramming files "to optimize the EyeSight camera assembly. These new files will address concerns the Adaptive Cruise Control system going into fail-safe mode and setting a DTC B280B: VDC Abnormal. When this condition occurs, normal operation is restored when cycling the ignition switch off / on." The dealers were directed to reprogram the EyeSight Stereo Camera.

123. On October 29, 2020, Subaru issued a TSB entitled "Vehicle Dynamic Control Module Optimization."[46] This TSB was applicable to 2020 Legacy and Outback vehicles. The TSB directed dealerships to reprogram the VDC Control Module, to address concerns of the Auto Vehicle Hold (AVH) not operating properly and enhance the braking feel related to the Adaptive Cruise Control.

124. On January 5, 2026, Subaru released a Product Enhancement Program ("PEP") entitled "EYESIGHT Product Enhancement Reprogramming File

---

[45] SUBARU OF AM., INC., *Reprogramming File Availability for EyeSight DTC B280B: VDC Abnormal,* TSB No. 07-170-20 (Feb. 21, 2020), https://static.nhtsa.gov/odi/tsbs/2020/MC-10171952-0001.pdf.

[46] SUBARU OF AM., INC., *Vehicle Dynamic Control (VDC) Control Module Optimization*, TSB No. 06-81-2020 (Oct. 29, 2020), https://static.nhtsa.gov/odi/tsbs/2020/MC-10182248-0001.pdf.

Availability."[47] This PEP addressed certain software updates for certain 2026 Subaru Outback models affecting the functionality of the Hands-Free Assist; Active Lane Change Assist; Pre-Curve Speed Control; Automatic Resume Assist; and Emergency Stop Assist with Safe Lane Selection functions of the EyeSight system.

125. Further, even prior to bringing the Class Vehicles to market, Subaru was cognizant of the difficulty in integrating the software of all systems required for these systems to function as advertised and integrating the different modules involved, including the VDC, driver assist, and adaptive cruise control modules. As a result, despite producing commercials and brochures that overstate the effectiveness and functionality of these systems, warnings in the owners' manuals for the Class Vehicles are vague and incompletely describe the limitations of the systems.

126. To the extent warnings in owners' manuals are made available to consumers after vehicle purchase or lease, they do not inform Plaintiffs and members of the Class that the AEB and LKA systems in Class Vehicles will frequently engage without cause and leave the driver and passengers more susceptible to a collision from traffic. These vague warnings, buried in owners' manuals hundreds of pages long, or in a thick booklet, are not specific enough or prominent enough to overcome

---

[47] SUBARU OF AM., INC., *EyeSight Product Enhancement Reprogramming File Availability,* TSB No. EEA-26 (Jan. 5, 2026), https://static.oemdtc.com/NHTSA-PDFs/MC-11027976-0001.pdf.

the perception of functionality that Subaru has promulgated in its brochures and commercials. In addition, the purchasers do not receive an owner's manual until after they have already completed the sales transaction.

127. Moreover, these warnings do not inform Plaintiffs and members of the Class that their vehicles may react differently each time it encounters the same situation, so that they are unable to even learn when their vehicle may malfunction. These warnings do not inform Plaintiffs and members of the Class that their AEB systems may stop Class Vehicles unnecessarily when their Vehicle is performing such mundane tasks such as driving past a home that has a trash can in front of it, exiting a driveway, driving onto a freeway, or moving around a curve in the road, or that they may be unable to change lanes when necessary, without the vehicle jerking them back.

128. Subaru has also been alerted to the widespread problems with these systems from various lawsuits filed both in the United States and in other countries where Subaru vehicles, with substantially similar systems installed, are sold.

129. The alleged Defects were inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

130. The existence of the Defects are material facts that a reasonable consumer would consider when deciding whether to purchase or lease a Subaru vehicle that was equipped with the EyeSight or RAB systems. Had Plaintiffs and

other members of the Class known the vehicles had these Defects, they would not have purchased or leased their vehicles or would have paid less for them.

131.   Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's driver-assistance system will function in a manner that will not pose a safety hazard and is free from defects that interfere with its role as a safety feature and make the vehicle unsafe. Further, Plaintiffs and members of the Class reasonably expect that Subaru will not sell or lease vehicles with known safety defects, such as the Defects, and will disclose any such defects to its consumers when it learns of them. They did not expect Subaru to fail to disclose the Defects to them and to continually deny the existence of the Defects.

## Subaru Has Actively Concealed the Defects

132.   While Subaru has been fully aware of the Defects in Class Vehicles, it actively concealed the existence and nature of the Defects from Plaintiffs and members of the Class at the time of purchase, lease, repair, and thereafter. Specifically, Subaru failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

   a. any and all known material defects or material nonconformity of the Class Vehicles, including the defects relating to the driver-assistance systems;

61

b. that the Class Vehicles, including their AEB systems, were not in good working order, were defective, and were not fit for their intended purposes; and

c. that the Class Vehicles were defective, despite the fact that Subaru learned of such defects through alarming failure rates, customer complaints, and other internal sources, as early as 2012.

133. In fact, even before releasing the Class Vehicles into the market, Subaru knew about the Defects due to its significant pre-production testing at its proving grounds and test tracks at Bifuka Research and Experimentation Center in Hokkaido, Japan. Furthermore, manufacturers such as Subaru inspect vehicles as they come off assembly and do systems checks on the vehicles to ensure they are working properly. Japan goes a step forward, mandating under law that carmakers such as Subaru produce a safety certificate for each vehicle to show it has passed such an examination to qualify for registration. Although Subaru is empowered under Japanese law to decide what training must be completed and who may be authorized to work as a qualified inspector, Subaru admitted in October 2017 that "company rules designated who was allowed to inspect cars had been inconsistent with government guidelines for 30 years."[48]

---

[48] Jonathan Soble, *Subaru Admits Inspection Failings, in Another Blow to Japan's Carmakers*, THE NEW YORK TIMES (Oct. 27, 2017), https://www.nytimes.com/2017/10/27/business/subaru-inspection-japan.html.

134. Despite such procedures and pre-production testing, Subaru never informed Plaintiffs and members of the Class that the Defects existed or compromised the safety of the Class Vehicles.

135. As a result of the Defects, Subaru and its authorized dealers were inundated with complaints regarding the Defects. However, Subaru has not made fixing the malfunctions a priority and instead instructed its dealerships and ambassadors that consumers can be advised to turn the driver-assistance systems off. However, this ignores the fact that the Defects exist, and that consumers paid for functional systems and the promise that Subaru would correct any defects pursuant to the warranties it issued.

136. Thus, when consumers present the Class Vehicles to authorized Subaru dealers for repair of the Defects, rather than repair the problem under warranty, Subaru has instructed dealers to deny the existence of the Defects, as experienced by Plaintiffs. Moreover, because the Defects are software related, the Subaru-authorized dealerships are neither equipped nor trained to provide a remedy.

137. To this day, Subaru still has not notified Plaintiffs and members of the Class that the Class Vehicles suffer from systemic defects that cause the driver-assist systems to malfunction, jeopardizing the safety of drivers, passengers, and the general public.

63

**The Agency Relationship Between Subaru of America, Inc.
and its Network of Authorized Dealerships**

138.  In order to sell vehicles to the general public, Subaru enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Subaru-branded vehicles, the authorized dealerships are also permitted under these agreements with Subaru to service and repair these vehicles under the warranties it provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, Subaru's authorized dealerships are Subaru's agents, and the consumers who purchase or lease Subaru vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Subaru vehicles locally.

139.  Further, Plaintiffs and members of the Class are the intended beneficiaries of Subaru's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Subaru. Subaru's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Subaru's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

140. Subaru issued the express warranty to the Plaintiffs and the Class members. Subaru also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Subaru is also responsible for the content of the Monroney Stickers on Subaru-branded vehicles. Because Subaru issues the express warranty directly to the consumers, the consumers are in direct privity with Subaru with respect to the warranties.

141. In promoting, selling, and repairing its defective vehicles, Subaru acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Subaru representatives and agents. That the dealers act as Subaru's agents is demonstrated by the following facts:

    a. The authorized Subaru dealerships complete all service and repair according to Subaru's instructions, which Subaru issues to its authorized dealerships through service manuals, TSBs, Technical Tip newsletter bulletins, and other documents, as well instructions that can be found only on Subaru proprietary software such as Select Monitor;

    b. Subaru advertises and promises that "[w]hen it comes to your Subaru, no one knows it better than our Factory Trained Technicians. That's because they have completed an extensive Subaru training curriculum to earn factory certification and understand the specific components

and technologies that are unique to all Subaru vehicles. They also use specialized tools and genuine Subaru parts to help maintain the safety and performance of your vehicle. All of this helps ensure that maintenance and repairs are done in the best way, the right way. We're here to help make it last."[49] As further described by "Subaru-U," which Subaru describes as "a unique partnership between Subaru of America, the retailer, and high performing ASE Education Foundation secondary and post-secondary schools," there is "entry-level training that is required of all Subaru technicians," and "Subaru Level 2 Instructor Led Training." Subaru-U "[s]tudents that are apprenticed at a Subaru retailer … are also eligible for additional training through Subaru"[50];

c. Consumers are able to receive services under Subaru's New Vehicle Limited Warranty only at its authorized dealerships, and they are able to receive these services because of the agreements between Subaru and the authorized dealers. These agreements provide Subaru with a significant amount of control over the actions of the authorized dealerships;

---

[49] *See* SUBARU OF AM., INC., *Factory Trained Technicians,* https://www.subaru.com/owners/car-care-tips/factory-trained-technicians.html (last visited May 10, 2026).

[50] *See* SUBARU UNIVERSITY, https://www.subaru-u.com/ (last visited May 10, 2026).

66

d. The warranties provided by Subaru for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e. Subaru dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f. Subaru controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Subaru's authorization;

g. Subaru has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising, which is standardized and approved by Subaru; and

h. Subaru implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Subaru dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

142. Indeed, Subaru's warranty booklets make it abundantly clear that its authorized dealerships are the agents for vehicle sales and service. The booklets,

67

which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at an "Authorized SUBARU Retailer." For example, the warranty booklets state, "[a]ny and all repairs must be performed by an Authorized SUBARU Retailer located in the United States." Further, these warranties "only apply if the vehicle was imported or distributed by [Subaru] and sold to the first retail purchaser by an Authorized SUBARU Retailer in the United States." Under the terms of the warranty, repairs will be performed by "any Authorized SUBARU Retailer anywhere in the United States."

143. Subaru has also designated its authorized dealerships to inspect and designate used Subaru vehicles as "Certified Pre-Owned," a decision which then obligates Subaru itself to provide a "Factory-Backed" "Certified Pre-Owned Powertrain Warranty" of seven years or 100,000 miles with a $0 deductible, as well as 24/7 Roadside Assistance. Subaru advertises the certified pre-owned program on its website (Subaru.com/vehicles/certified-pre-owned.html), where it promises "[e]very Certified Pre-Owned vehicle gets a 152-point safety inspection, with any item repaired or replaced if it doesn't meet Subaru standards." The 152-point inspection list requires the Dealer Name, Dealer Code, a "Subaru Trained Technician" who attests "I certify that all mechanical items have been inspected," and a dealership Service Manager who attests "I certify that all mechanical repair standards have been met."

144. Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Subaru. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Subaru or its agent dealerships to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and SOA.

### Subaru Has Unjustly Retained A Substantial Benefit

145. Subaru unlawfully failed to disclose the Defects to induce Plaintiffs and other Class Members to purchase or lease the Class Vehicles.

146. Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including those conducted with Plaintiffs.

147. Subaru unlawfully induced Plaintiffs and class members to purchase their respective Class Vehicles by concealing a material fact (the defective AEB and LKA systems). Had Plaintiffs and members of the Class known of the Defects, they would have paid less for the Class Vehicles or would or not have purchased them.

148. Accordingly, Subaru's ill-gotten gains, benefits accrued in the form of increased sales, and profits resulting from the material omissions that did—and likely will continue to—deceive consumers, should be disgorged.

## V.   CLASS ACTION ALLEGATIONS

149.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

150.   The Nationwide Class and State Classes are defined as:

**Nationwide Class:** All persons residing in the United States, including its territories, who purchased or leased, other than for resale, any of the following vehicles: 2023-2026 Subaru Legacy, Outback, and Ascent vehicles; 2024-2026 Subaru Impreza and Crosstrek vehicles; 2022-2026 Subaru Forester and WRX vehicles; and 2025-2026 BRZ vehicles.

**Maine Class:** All persons who purchased or leased, other than for resale, any Class Vehicle in the State of Maine.

**Virginia Class:** All persons who purchased or leased, other than for resale, any Class Vehicle in the Commonwealth of Virginia.

151.   Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs

70

reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

152. There is a well-defined community of interest in the litigation, and the Class is readily ascertainable.

153. **Numerosity:** Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, upon information and belief, hundreds of thousands of the Class Vehicles have been sold in the United States. As such, the number of prospective class members is great enough such that joinder is impracticable. The disposition of prospective class members' claims in a single action will provide substantial benefits to all parties and to the Court. The prospective class members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various states.

154. **Typicality:** Plaintiffs' claims are typical of the claims of all prospective class members in that Plaintiffs and the prospective class members purchased or leased a Class Vehicle designed, manufactured, and distributed by Subaru and equipped with driver-assistance systems. Plaintiffs and all prospective members of the Class have been damaged by Defendant's misconduct in that the Class Vehicles all suffer from the Defects and members of the Class have incurred or will incur the cost of overpaying for the Class Vehicles and repairing or replacing Class Vehicles

71

that have been damaged as a result of the Defects. Furthermore, the factual bases of Subaru's misconduct are common to all prospective class members and represent a common thread resulting in injury to all prospective class members.

155. **Commonality:** There are numerous questions of law and fact common to Plaintiffs and the prospective class members that predominate over any question affecting individual prospective class members. These common legal and factual issues include the following:

    a. Whether the Class Vehicles suffer from their respective Defects;

    b. Whether the Defects constitute an unreasonable safety risk;

    c. Whether and when Defendant knew about the Defects;

    d. Whether Defendant knew or reasonably should have known of the Defects before selling and leasing the Class Vehicles to prospective class members;

    e. Whether the Defects constitute material facts;

    f. Whether Defendant has a duty to disclose its knowledge of the Defects to Plaintiffs and prospective class members;

    g. Whether Defendant breached the implied warranty of merchantability under applicable state law;

72

h.  Whether Defendant should be declared financially responsible for notifying all prospective class members of the Defects and for expenses of repairing the Defects;

i.  Whether Defendant is obligated to inform prospective class members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective systems; and

j.  Whether damages, restitution, compulsory, or other relief are warranted.

156.  **Adequate Representation:** Plaintiffs will fairly and adequately protect prospective class members' interests. Plaintiffs have retained attorneys experienced in prosecuting class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

157.  **Predominance and Superiority:** Plaintiffs and the members of the Class have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most members of the Class would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the claims of individual members of the Class, it is likely that only a few members of the Class could afford to seek legal redress

73

for Defendant's misconduct. Absent a class action, members of the Class will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

158. In the alternative, the Class may be certified because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**VI.    CAUSES OF ACTION**

<u>COUNT ONE</u>

**FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT**
**(On Behalf of the Nationwide Class or, in the Alternative, the State Classes)**

159.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

160.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against Defendant.

161.    Subaru knew that the Class Vehicles suffered from the Defects impacting safety features which were defectively designed and/or manufactured and were not suitable for their intended use.

162.    Defendant concealed from and failed to disclose to the Plaintiffs and members of the Class the defective nature of the Class Vehicles.

163.    Defendant was under a duty to the Plaintiffs and members of the Class to disclose the defective nature of the Class Vehicles because:

    a.    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

    b.    The omitted facts were material because they directly impact the safety of the Class Vehicles;

c.  Defendant knew the omitted facts regarding the System Defects were not known to or reasonably discoverable by the Plaintiffs and Class members;

d.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.  Defendant actively concealed the defective nature of the Class Vehicles from the Plaintiffs and AEB Class members.

164.    The facts concealed or not disclosed by Defendant to the Plaintiffs and the other Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's system operates correctly is a material safety concern. Had the Plaintiffs and Class members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

165.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce the Plaintiffs and Class members to act thereon. The Plaintiffs and the other Class members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from the Plaintiffs' and Class members' purchase or lease of Defendant's defective Class Vehicles.

166.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

167.    As a direct and proximate result of Defendant's misconduct, the Plaintiffs and Class members have suffered and will continue to suffer actual damages. The Plaintiffs and the Class reserve their right to elect either (a) rescind their purchase or lease of the defective Class Vehicles and obtain restitution, or (b) affirm their purchase or lease of the defective Class Vehicles and recover damages.

168.    Defendant's acts were done maliciously, oppressively, and deliberately, with intent to defraud, and in reckless disregard of the Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount determined to be sufficient to deter such conduct in the future.

**COUNT TWO**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class or, in the alternative, the State Classes)**

169.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

170.    Plaintiffs bring this claim on behalf of the Nationwide Class and, additionally or in the alternative, each of the State Classes.

171. Defendant is and was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted, and sold the Vehicles.

172. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

173. Plaintiffs and the other Class members purchased the Vehicles manufactured and sold by Defendant in consumer transactions.

174. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition, and were not fit for the ordinary purpose for which cars are used. The Class Vehicles left Defendant's possession and control with defective collision avoidance and mitigation systems that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to safety.

175. Defendant knew before the time of sale to Plaintiffs and the other Class members, or earlier, that the Vehicles were produced with defective collision avoidance and mitigation systems that were unfit for ordinary use, that rendered the Class Vehicles unfit for their ordinary purposes, and that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Class Vehicles. This knowledge was based on Defendant's own industry standard internal validation of its vehicles prior to launching new models, internal testing, knowledge about and familiarity with the collision avoidance and mitigation systems included in the Class

Vehicles, history of similar problems with similar features malfunctioning or failing in prior models, and complaints by consumers and third parties.

176. The existence and ubiquity of the Defects is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide.

177. Despite Plaintiffs' and the other Class members' normal, ordinary, and intended uses, the Class Vehicles experienced and continue to experience the Defects.

178. The collision avoidance and mitigation systems in the Class Vehicles, and the Class Vehicles themselves are, and at all times and were, not of fair or average quality, and would not pass without objection.

179. All conditions precedent have occurred or been performed.

180. Plaintiffs and Class members have used their Class Vehicles in a manner consistent with the Class Vehicles' intended use, and have performed each and every duty required under Defendant's warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

181. Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

182. In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for warranty repairs and coverage relating to the Defect from other members of the Class.

183. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Class Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

184. Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the defective regulators.

185. Specifically, Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the Defects existed, and the warranties might expire before a

reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the Defects after the existence of the Defects came to the public's attention and sat on its reasonable opportunity to cure or remedy the Defects, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the Defects or cure its breaches of warranty.

186. As such, Defendant should be estopped from disclaiming liability for its actions.

187. Privity of contract is not required for consumer implied warranty claims under the relevant laws. However, Plaintiffs and the other Class members had sufficient direct dealings with Defendant and its agents (dealers) to establish privity of contract.

188. Defendant's authorized dealers are agents of Subaru, and there is a factually plausible agency relationship between Subaru and its dealerships. This agency is factually supported by at least the following: 1) Subaru issues TSBs to its dealerships relating to the issues with its vehicles; 2) Subaru's warranty directs Class Vehicle owners to present their vehicles to Subaru-authorized dealerships for repairs; and 3) Subaru requires dealerships to submit detailed data to it regarding repairs performed at dealerships. These considerations demonstrate the agency

relationship between Subaru and its dealerships, with whom Plaintiffs interacted and transacted as alleged herein.

189. Privity is also not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers (i.e., its agents); specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and the other Class members. Privity is also not required because Plaintiffs' and the other Class members' Vehicles are inherently dangerous due to the aforementioned defects and nonconformities.

190. Defendant also had direct dealings with Plaintiffs and Class members by providing warranties directly to Plaintiffs and Class members. Defendant provided the NVLW directly to Plaintiffs and Class members, creating privity between the parties.

191. Plaintiffs and the other Class members suffered and will suffer diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT THREE
### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Nationwide Class)**

192.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

193.  Plaintiffs bring this claim on behalf of themselves and each of the State Classes under the laws of their respective home states.

194.  This claim is pleaded in the alternative to the other claims set forth herein.

195.  As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of Class Vehicles manufactured with defective collision avoidance and/or mitigation features.

196.  Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct alleged herein, Plaintiffs and the Class members were not receiving Class Vehicles of the quality, nature, fitness, or value that had been represented by Defendant, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class members expected that when they purchased or leased their Class Vehicles, the Class Vehicles would not be manufactured with defective collision avoidance and/or mitigation features.

197. Defendants have been unjustly enriched by their fraudulent, deceptive, unlawful, and unfair conduct, and by their withholding of benefits and unearned monies from Plaintiffs and the Class members at the expense of these individuals.

198. Equity and good conscience advise against permitting Defendants to retain these woe begotten profits and benefits.

## VII.   PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

A.  An order certifying the proposed Nationwide Class and or State Classes, designating Plaintiffs as representatives of the Classes, and designating the undersigned as Class Counsel;

B.  A declaration that Defendant is financially responsible for notifying all members of the Classes about the defective nature of the Class Vehicles and the existence of the Defects, including the need for repairs;

C.  An award to Plaintiffs and the Classes for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

D.  A declaration that Defendant must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits it received from the sale or

lease of its Class Vehicles or make full restitution to Plaintiffs and members of the Classes;

E.   An award of attorneys' fees and costs, as allowed by law;

F.   An award of pre-judgment and post-judgment interest, as provided by law;

G.   Leave to amend the Complaint to conform to the evidence produced at trial; and

H.   Such additional or different relief as may be appropriate at law or in equity under the circumstances.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  May 11, 2026

/s/ Andrew W. Ferich
Andrew W. Ferich (NJ Bar No. 015052012)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
aferich@ahdootwolfson.com

Sarper Unal (*pro hac vice* to be filed)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
sunal@ahdootwolfson.com

85

A. Brooke Murphy (*pro hac vice* to be filed)
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, Oklahoma 73108
T: (405) 389-4989
E: abm@murphylegalfirm.com

*Counsel for Plaintiffs & the Proposed Class*

86

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, I hereby certify that to the best of my knowledge the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated. I further certify that I know of no party, other than the putative class members, who should be joined in the action at this time.

DATED:  May 11, 2026                    */s/ Andrew W. Ferich*
                                        Andrew W. Ferich